AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

FILED

JUN - 8 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

for the

Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

LG K330 IMEI #354890075909271,
SAMSUNG GALAXY NOTE 8, IMEI #358502082263339,
LG SP200 MEID #35198009129080.

)
)
)
)
)
)

Case No. 1:18-SW-311

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (Property to be Searched).

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (Property to be Seized).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of and possession with intent to distribute controlled substance |
| 21 U.S.C. § 846 | Conspiracy to distribute controlled substance |
| 21 U.S.C. §§ 952, 963 | Smuggling of controlled substance, and conspiracy to smuggle controlled subst. |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

AUSA Toby Tobler/SAUSA Alex Iftimie

*Applicant's signature*

James Chang, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8 Jan 18

City and state:  Alexandria, Virginia

/s/

Ivan D. Davis
United States Magistrate Judge



UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF 1. BLACK LG K330 IMEI #354890075909271 2. BLACK SAMSUNG GALAXY NOTE 8 IMEI #358502082263339 3. BLACK LG SP200 MEID #35198009129080 LOCATED AT THE HIGH INTENSITY DRUG TRAFFICKING AREA VAULT, LOCATED AT 6715 LITTLE RIVER TURNPIKE, ANNANDALE, VIRGINIA. | Case No. 1:18-SW-311 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, James Chang, Special Agent with the United States Department of Homeland Security,
Homeland Security Investigations ("HSI"), being first duly sworn, hereby depose and state as
follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a search warrant authorizing the examination of property – three
electronic devices further described in Attachment A – which are currently in law enforcement's
possession, and the extraction from that property of electronically stored information described
in Attachment B.

2.      I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have
been so employed since December 2011.  Since January 2018, I have been assigned to the HSI
High Intensity Drug Trafficking Area (HIDTA) Group in HSI District of Columbia (DC).  From

July 2016 to December 2017, I was assigned to the Joint Task Force-Investigations at HSI headquarters.  From May 2016 to July 2016, I was assigned to the Commercial Fraud Group in HSI Laredo.  From October 2012 to May 2016, I was assigned to the Human Smuggling Group in HSI Laredo.  From December 2011 to October 2012, I was assigned to HIDTA-Financial in HSI Laredo.  I have received formal training at the Federal Law Enforcement Training Center and have experience in narcotics investigations and human smuggling investigations.  I have participated in multiple separate investigations involving distribution of controlled substances and undocumented aliens.  As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court-authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons under investigation, including wiretap communications of human smugglers.  I have worked alongside and consulted with many law enforcement officials and other professionals experienced in drug and human smuggling related investigations.

3.      Based on my training and experience, I am familiar with how drug traffickers communicate and operate.  For example, I am aware that drug traffickers discuss criminal matters over the telephone and often use coded or vague language to communicate amongst each other.  I am aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources in the furtherance of the illegal activities.  I am familiar with the typical make up and operation of gangs and drug trafficking organizations including the distribution, storage, and transportation of the illegal

2

drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

4. Based on my training and experience, I am also aware of the way in which narcotics traffickers and other co-conspirators in criminal activity use cellular and other telephones, and computers in furtherance of their criminal activity. Narcotics traffickers use cellular telephones and computers to further their illegal activities and in many cases drug dealers will frequently "dump" or discard their phones and/or phone numbers in the belief that, by so doing, they can avoid detection and thwart the efforts of law enforcement. Cellular telephones also enable co-conspirators to remain in constant or ready communication with one another without restricting either party to a particular geographic location, thus hampering surveillance by law enforcement authorities. These communications take place both through telephone conversations and text messaging. Narcotics traffickers also frequently have access to several cellular telephones and they periodically use newly acquired cellular telephones, or frequently change cellular telephones, to avoid detection and attempt to thwart apprehension by law enforcement.

5. Drug traffickers communicate with customers, suppliers, and co-conspirators via cellular telephones and computers. Drug traffickers use cellular telephones and computers to arrange meetings, request drugs, take drug orders, and arrange for co-conspirators to obtain and distribute drugs. To avoid detection by law enforcement, narcotics traffickers commonly use more than one cellular telephone and often send text messages, rather than engage in oral communications.

3

6.      I know that cellular telephones and computers used by narcotics traffickers contain valuable information and evidence relating to their narcotics trafficking.   Such information consists of, but is not limited to, call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System ("GPS") data, browser history, and any other stored electronic data.  This information can (i) reflect the preparation for, arrangement of, and commission of the illegal trafficking of drugs; (ii) identify locations where narcotics traffickers traveled to before and after transporting or selling narcotics; (iii) reflect the ownership and use of the cellular telephones and computers by the narcotics traffickers; (iv) document meetings and communications between narcotics traffickers, their customers, associates, and co-conspirators; (v) reflect communications between narcotics traffickers and other individuals discussing the trafficking of narcotics; (vi) reflect communications between narcotics traffickers and other individuals who may have assisted or provided support in the trafficking of narcotics; (vii) document or contain evidence of the obtaining, secreting, cutting, manufacturing, transferring, expenditure and/or the concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of narcotics.

7.      I know that individuals involved in narcotics trafficking often use cellphone cameras to take pictures of themselves as well as other members of their organization, often engaging in illegal activities such as the distribution of narcotics and the possession of firearms, as well as to take pictures of assets acquired with the proceeds of narcotics trafficking.

8.      I know that individuals involved in narcotics trafficking often use cellphone video recording devices to take video recordings of other members of their organization often engaging

4

in illegal activities such as the distribution of narcotics, as well as video recordings documenting the purchase of assets with the proceeds of narcotics trafficking.

9.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. This affidavit is based on my personal observations and information recited to me by other law enforcement officers.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

10.     This affidavit is being submitted in support of applications that seek authorization to search the following devices, which are currently located in the High Intensity Drug Trafficking Area Vault, located at 6715 Little River Turnpike, Annandale, Virginia 22003:

1.   Black LG K330 (IMEI #354890075909271)

2.   Black Samsung Galaxy Note 8 (IMEI #358502082263339)

3.   Black LG SP200 (MEID #35198009129080)

11.     The applied-for warrant would authorize the forensic examination of the devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

12.     On or about April 28, 2018, United States Customs and Border Protection (CBP) officers assigned to the DHL facility in Cincinnati, Ohio, selected a specific parcel (hereinafter "target package") for an enforcement examination. The parcel arrived into the United States as international cargo and was sent from Colon, Panama. It was also addressed and in transit to "Dylan Boyce" at the premises located at 4006 Kansas Ave. Northwest, Apartment #2, Washington, D.C. 20011. The target package was labeled with the unique DHL identifying

5

tracking number 4024422054, it manifested as "Documents," and it was opened for inspection by CBP officers revealing approximately 962.4 grams (gross weight) of a white powder substance concealed within the shipment. A sample of the white powder substance was field-tested by CBP and gave a positive response consistent with cocaine, a schedule II controlled substance. Furthermore, based upon your affiant's training and experience, 962.4 grams of cocaine would be obtained and possessed – or it would be attempted to be obtained and possessed – for redistribution purposes, not personal use. Furthermore, based upon your affiant's training and experience, your affiant knows that violence is very frequently associated with illegal narcotics trafficking.

13.     As a result of the government's seizure of the above-noted cocaine, on May 2, 2018, at approximately 11:12 a.m., HSI, working with other law enforcement agencies, conducted a controlled delivery of the target package to the premises located at 4006 Kansas Avenue, NW, Apartment #2, Washington, D.C. For purposes of the controlled delivery, all of the actual drugs were removed from the target package and a sham product was included inside the package. During the controlled delivery, an undercover officer (UC) posing as a DHL package deliverer took the package to 4006 Kansas Avenue NW, Apartment #2, knocked on the door, and no one answered. Thereafter, the UC knocked on the door for Apartment #1 at the same address and no one answered. Next, the UC placed a yellow DHL tag on the doorknob for Apartment #2 and left the area in the UC vehicle. The DHL tag had the UC's telephone number and indicated an attempted delivery at the residence.

14.     At approximately 12:24 p.m., the UC received a call about the package and spoke to an individual who sounded like an Hispanic male according to the UC. During their

conversation, the UC agreed to deliver the package back to the residence, and, when the UC brought the package back to the residence at approximately 12:40 p.m., an individual later identified as Dionisio Garcia, also known as Dionisio Mazara-Garcia and Dionicio Garcia, took possession of the package in front of the Kansas Avenue residence. Garcia signed for the package on the DHL delivery form by printing the name "Dilan" and also making an illegible signature. Garcia then took the package inside of Apartment #2, and, at approximately 12:45 p.m., Garcia was observed by law enforcement exiting the rear of Apartment #2, placing the package in the trunk of a burgundy Honda Accord, and then returning back inside of Apartment #2.

15.     At approximately 3:30 p.m., law enforcement executed a search warrant at 4006 Kansas Ave, Northwest, Apartment #2, Washington, D.C. After law enforcement officers and agents announced their presence and as they were about to enter Apartment #2, an individual later identified as Angel Vila came out of Apartment #3, which was located in the same building, a floor above Apartment #2.

16.     In or around the same time period, Garcia tried to run from the building out of the rear entrance to Apartment #3. He was detained by law enforcement and advised of his <u>Miranda</u> rights in Spanish. Garcia waived his rights and agreed to answer law enforcement questions. During the interview, Garcia admitted that he received the package for another person; that he (Garcia) was supposed to receive $500 as payment for receiving the package; and that the other person was supposed to pick the package up later that evening. Garcia also said that he knew the package would contain something illegal and that he thought the package might contain ecstasy, which your affiant knows to be a controlled substance. Garcia also indicated that he had

7

previously received a DHL package at the same Kansas Avenue address for the same person and that he received $300 as payment for the package on that prior occasion. Garcia's identify was confirmed by his driver's license.

17.     At approximately 3:40 p.m., your affiant asked Vila, who resided in Apartment #3, for consent to search Apartment #3, which he granted both orally and in written form. While being interviewed by your affiant and HSI Group Supervisor (GS) Domiciano Martinez, Garcia later stated that his cellphones were upstairs in Apartment #3 on top of the table in the living room. Special Agent (SA) Cameron Foster and Metropolitan Police Department Detective Erick Alvarado found three cellular telephones (a Samsung Galaxy Note 8, a LG K330, and a LG SP200) located on top of a table inside of the living room of Apartment #3. Thereafter, Detective Alvarado brought the cellular telephones downstairs and handed them to your affiant.

18.     Garcia was interviewed about the cellular telephones by your affiant and GS Martinez. Garcia acknowledged that the Samsung Galaxy Note 8 and LG K330 were his cellular telephones and he gave law enforcement both written and oral consent to search them. The third telephone, that is, the LG SP200 cellular telephone, was neither claimed by Garcia nor anyone else present at the Kansas Avenue residence. When questioned by law enforcement, Angel Vila identified the LG SP200 as a community telephone that was used to facilitate prostitution activities. Vila also indicated that the LG SP200 was probably used by Garcia to call the person who would be picking up the package containing narcotics. In response to questioning by your affiant and GS Martinez, Garcia confirmed that he (Garcia) used the LG SP200 to call the person he obtained the packages for (the person who was to provide Garcia $500 and previously provided $300 for the packages) so that the telephone call could not be traced back to Garcia.

8

19.     Ultimately, the cellular telephones were seized by HSI and entered into an evidence vault later that night, May 2, 2018. On or about May 21, 2018, all three cell phones were taken out of the evidence vault by your affiant and SA Foster, and the IMEI and/or MEID numbers were transcribed from the back of each phone, as follows: Samsung Galaxy Note 8 (IMEI #358502082263339), LG K330 (IMEI #354890075909271), and LG SP200 (MEID #35198009129080). The evidence has been maintained in HSI custody in Virginia since that date.

20.     There is probable cause to believe that the electronically stored information described in Attachment B is recorded on the devices described in Attachment A. Based upon my experience and investigation in this case, I believe that Garcia, as well as other persons as yet unknown, were involved in an ongoing conspiracy to distribute cocaine and possibly other narcotics. I also believe Garcia may have used the devices described in Attachment A to coordinate with co-conspirators regarding the distribution of cocaine, and to otherwise further this conspiracy both inside and outside of the United States. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of cellular telephones, may identify other persons involved in narcotics trafficking activities, and are transferrable from cellular telephone to cellular telephone.

21.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of Garcia and co-conspirators, such as telephone numbers, made and received calls, contact names,

9

electronic mail (email) addresses, appointment dates, messages, pictures and other digital information, are stored in the memory of the electronic devices described in Attachment A.

22.     The devices described in Attachment A are currently in the possession of HSI and located at 6715 Little Rive Turnpike, Annandale, VA 22003. I know that the devices have been stored such that their contents are, to the extent material to this investigation, in substantially the same state or condition as they were when the devices first came into the possession of HSI.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing

10

and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

11

d. GPS: A Global Positioning System ("GPS") navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

12

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24.   Based on my training, experience, and research, I have reason to believe that the devices described in Attachment A have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and internet search device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26.     *Forensic evidence*:  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the devices described in Attachment A were used and when.  There is probable cause to believe that this forensic electronic evidence might be on the devices described in Attachment A because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically-stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

14

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination*: Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices described in Attachment A consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices described in Attachment A to human inspection in order to determine whether they contain evidence described by the warrant.

28. *Manner of execution*: Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

29. Because forensic examiners will be conducting their search of the devices described in Attachment A in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

I respectfully submit that this affidavit supports probable cause for a warrant to search the

devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____

Special Agent James Chang
Homeland Security Investigations

Subscribed and sworn to before me
This _8th_ day of on June, 2018.

_____/s/_____
Ivan D. Davis
United States Magistrate Judge

16

## ATTACHMENT A

The property to be searched are a black LG K330 (IMEI #354890075909271), black LG SP200 (MEID #35198009129080), and black Samsung Galaxy Note 8 (IMEI #358502082263339) (hereinafter "the devices"). The devices are currently located in the High Intensity Drug Trafficking Area Vault, located at 6715 Little River Turnpike, Annandale, Virginia 22003.

This warrant authorizes the forensic examination of the device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

All records, items, information, and data from the devices described in Attachment A that involve Dionisio Garcia (aka Dionisio Mazara-Garcia and Dionicio Garcia) and relate to violations of Title 21, United States Code, Sections 841, 846, 952, and 963, including, but not limited to:

a. Records and information relating to attempts to distribute controlled substances, including cocaine;

b. Records and information relating to the identity of accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of controlled substances;

c. Records and information relating to the identity of co-conspirators, criminal associates, or others involved in smuggling controlled substances;

d. Records and information relating to travel to or presence at locations involved in the smuggling of controlled substances, such as stash houses, load houses, or delivery points;

e. Records and information identifying the user of, or persons with control over or access to, the device; and/or

f. Records and information that place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2